# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

OTIS JACKSON,

    Plaintiff,

        v.

MOTOROLA, INC.,

    Defendant.

No. 09 C 1927
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Plaintiff, Otis Jackson, sued his former employer, Motorola, Inc., for disability, age, and race discrimination and retaliation. Motorola has moved for summary judgment. For the following reasons, the motion is granted on all counts.

## I. FACTUAL BACKGROUND

Otis Jackson worked as an engineer for Motorola for twenty-one years. In 1999 or 2000, he became a Senior Engineer in the Systems Integration and Test ("SIT") Department at Motorola. Key personnel above him in that department were Dan Russ, a Lead Manager who was Jackson's immediate supervisor, Steve Vedra, Russ's boss who was an Engineering Manager, and Sheilah Quintana, another lead manager. Russ and Vedra are Caucasian. Quintana is Hispanic.

SIT is a department within Motorola's Networks and Enterprise ("N&E") unit. It is located in Schaumburg, Illinois. SIT builds and tests communications systems primarily for sale to public entities. Within SIT, Mr. Jackson's job was to develop "test cases" and then put those cases through functionality testing in a laboratory. Test cases are approved in Formal Technical

Review ("FTR") meetings, the purpose of which is to peer-test the protocols. After FTR, systems in development are run through the test cases.

A. Back Injury and Condition

During the testing phase, engineers bend down, reach up, and lift equipment as needed. At the end of one of his test cases, while disassembling wires, Mr. Jackson injured his back. This incident occurred in 2001. On November 18, 2002, he took FMLA leave in connection with his back injury. Sometime in 2003, he was diagnosed with a herniated disc and had a surgery known as a "laminectomy" to repair it. He returned to work in October 2003. When he returned he was restricted by his physician to light work, with no lifting over twenty-five pounds and no repetitive bending at the waist. These restrictions were in place until November 21, 2003, when the physician relaxed the lifting restriction to thirty-five pounds. On February 9, 2004, Jackson's physician placed him on a permament fifty-pound lifting restriction and an order not to engage in "prolonged or repetitive" bending at the waist.

Mr. Jackson still finds lifting and bending difficult. He has an eleven year-old grandson. The boy helps Mr. Jackson lift and carry his groceries. Prior to the injury, Mr. Jackson would play in the grass with his grandson but now can only throw and catch a ball and other "limited" activities.

Though not limited by his physician, Jackson asserts that his condition inherently limits his walking. He experiences pain upon walking one or two blocks, at which point he stops to rest. He sometimes walks as much as two blocks to catch public transportation.

Jackson used to engage in substantial home upkeep like plumbing repairs and lawn mowing, but now only does minor repairs such as changing light bulbs and instead calls professional help for more substantial tasks.

Jackson is able to get into and out of bed, bathe and generally groom himself. Jackson can drive and shop. Getting dressed takes longer than before the injury. It now takes him roughly twenty minutes whereas it used to take him five to ten minutes.

B. Performance and Termination

From 1985 through 2000, Jackson received "Exceeds Standards," or the rough equivalent, as performance ratings in his annual reviews. In 2001 & 2002, the parties dispute what the ratings say. Jackson contends he received "SE+ME" ratings in 2002, which he interprets as "Surpasses Expectations + Meets Expectations." Motorola claims the reviews are actually ME, or "Meets Expectations," in 2001, and "MX," essentially the same thing, in 2002. Neither side cites to an exhibit supporting their claim, so the tie clearly goes to Jackson as the non-movant.

There is no dispute as to what ratings Jackson was given in 2004 and 2005, which was "Needs Improvement," though Jackson vigorously disputes the merits of those ratings. The 2004 review was completed by Russ with some input from Quintana. The reviews cited problems such as not thoroughly incorporating changes from the peer-review process into his test cases, taking longer than expected with tasks, a lack of self-sufficiency, and an inability to mentor new hires. The 2005 review cites similar problems, with a particular emphasis on his inability to accomplish tasks without resorting to help from other people. The report described this as the key "delta between Otis and his peer." According to the report, peers who have worked with

3

similar systems "for less time require less support and complete tasks more timely." Both contemporaneously and in the context of this litigation, Jackson submitted his disagreements with substantially all of these assessments of his performance.

Because of his back-to-back "Needs Improvement" ratings in 2004 and 2005, Motorola placed Jackson on a Performance Improvement Plan ("PIP"). The PIP was commenced in a meeting with Lavine Douglas, Russ, and Vedra that took place on May 16, 2006. The PIP was supposed to run for ninety days. In that ninety-day period, Jackson was to accomplish specific tasks commensurate with someone in his pay grade who had two to three years experience in SIT. Jackson was given a mentor (he claims it was one, Motorola asserts it was two) and Dan Russ was to meet with him once weekly to track his progress. Jackson claims the "weekly" meetings only happened once per month during the PIP.

In 2006, Motorola announced the merger of two business units, the Government and Enterprise Mobility Solutions ("GEMS" ) unit and the Networks unit. The merger formed the N&E unit in which SIT is a department. As part of the merger, Motorola directed departments within N&E to commence a Reduction in Force ("RIF"). As Engineering Manager in SIT, Vedra was charged to implement the RIF. He consulted with Human Resources to identify people based on various criterion such as work performance within peer group, skill set, and criticality of work performed. Vedra claims these criterion alone informed his selections of persons to be laid off. Specifically, he has sworn via affidavit that the Needs Improvement rating and Jackson's performance in the PIP were his sole motivation for selecting Jackson. Jackson was informed of his selection for termination as part of the RIF on September 13, 2006. He was terminated on November 17, 2006.

<u>C. Race and Age</u>

Mr. Jackson is an African-American and was born on August 22, 1952, making him 54 years old on the date of his termination. According to Jackson, at the time of his termination SIT had "about 5 black employees" out of thirty-five to forty total employees in SIT.

At some point, Jackson began to feel that his declining performance reviews were related to his race, age, gender, or disability. Jackson wrote in response to his 2005 review that "[s]ince it's stated that I struggle and lack a detailed system understanding, I would hope in the future, direction training and the opportunity to grow would be made available to me (like it is to some) in SIT." He claims this was a veiled reference to discriminatory treatment.

As an example of opportunities not presented to him, Jackson describes an incident in 2004 in which he asked his supervisor, Sheilah Quintana, to receive training on a new technology called the "NICE" system. Jackson claims that in August of 2004, two other employees, both white and in their mid-20s (Eric Bohn and Julie, whose surname Jackson cannot recall) received training on NICE. Bohn, who shared a supervisor with Jackson, later received a raise and promotion which Jackson did not. Dan Chigi, Dan Posacki, and Suda (surname omitted) also were given raises and promoted while Jackson was not. Chigi and Posacki are white, Suda is Asian. All were in their twenties.

Jackson made an appointment to see Lavine Douglass for April 16, 2006. In that meeting, he complained of racial discrimination. Douglas said she would relay his charge to Russ and Vedra. Jackson heard nothing back.

In 1999 or 2000, a sixty-two-year-old black man was handed a broom and told to sweep in a corner.  However, technicians are frequently told to clean up when equipment is moved around, including younger, non-minority technicians.

In 1989 or 1990, a former boss asked another employee "where's that nigger?," apparently referring to Jackson.  Unbeknownst to the former boss, Jackson was in earshot.  A similarly offensive term was overheard on ballfields near Motorola (where Motorola employees frequently gather) around the same time.

### D.  Proceedings

As mentioned above, Jackson was terminated on November 17, 2006.  He filed a simultaneous charge of discrimination with the Illinois Department Human Rights and the EEOC on January 19, 2007.  The EEOC issued a right to sue letter to Jackson on January 8, 2009.  This lawsuit was filed on March 28, 2009.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the evidence demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The evidence submitted in summary judgment briefing must be admissible at trial under the Federal Rules of Evidence.  *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007).  The court evaluates admissible evidence in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby*, 477 U.S 317, 324 (1986); *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005).  The party who bears the burden of proof on an issue must affirmatively demonstrate that there is a genuine issue of material fact

that requires a trial to resolve.  *Celotex Corp. v. Catrett*; *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

## III. PRELIMINARY ISSUES

Two statements of fact are meaningfully contested.  The first is Plaintiff's statement that he "only knows of one other individual in SIT that was terminated as [*sic*] Motorola's 'reduction in force', Ralph Simmons.  He is African-American and about the same age as Jackson." Motorola objects to this assertion for lack of foundation because Plaintiff has not firmly established that Simmons was the only other African-American terminated through the RIF, only that Simmons is the only other layoff Jackson is aware of.  Motorola's objection is sustained.

Second, Jackson asserts that shortly after he was terminated, he "was told" by two former colleagues that Motorola was hiring into SIT and that a white male was hired as a Test Engineer for SIT.  This is, of course, classic hearsay and is therefore inadmissable.

## IV. DISCUSSION

### A. Disability

Mr. Jackson is not "a qualified individual with a disability."  The ADA defines "disability" as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of the individual;
> (B) a record of such an impairment;
> (C) being regarded as having such an impairment.

42 U.S.C. § 12111(2).[1]  Neither (B) nor (C) are at issue[2], so I am left to consider whether Mr.

Jackson has "a physical or mental impairment that substantially limits one or more of the major

life activities of the individual."  *Id.*  Doing so calls for a three-step inquiry, asking whether the

plaintiff's condition is a qualifying "impairment," whether "major life activities" are impacted,

and whether the impairment "substantially limits" those major life activities.  *Bragdon v. Abbott*,

524 U.S. 624, 631 (1998); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 197 (7th Cir. 2005).

Motorola appears to concede that Jackson's back condition is a physical impairment.  They

further concede that the two principal areas Mr. Jackson claims are affected - walking and

performing manual tasks such as lifting, dressing, shopping, and self-grooming - are major life

activities.  All that remains, then, is to consider whether a reasonable jury could conclude that

these activities are "substantially limited" so as to render Mr. Jackson disabled.

Under federal regulations, an activity is "substantially limited" if someone is either

"unable to perform" it or the person is "significantly restricted as to the condition, manner, or

---

[1]The ADA was dramatically overhauled in 2008 via the Americans with Disabilities
Amendments Act. *See generally* ADAA § 2(b), Pub. L. No. 110-325, 122 Stat. 3553, 3554.  But
the changes became effective January 1, 2009 and the Seventh Circuit has held that the changes
were not intended to apply retroactively to conduct which occurred before that date.
*Fredrickson v. UPS*, 581 F.3d 516, 521 n. 1 (7th Cir. 2009) (citing *Lytes v. DC Water & Sewer
Auth.*, 572 F.3d 936, 939-42 (D.C. Cir. 2009)).  I therefore "look to the law in place prior to the
amendments." *Id.*

[2]The Plaintiff in his response hints at - but does not develop - an argument that Motorola
regarded him as disabled as having an ADA-qualifying impairment under 42 U.S.C. § 12111
(2)(C).  This is clearly not the case.  While the Defendant certainly knew of Mr. Jackson's
condition, that is not what the ADA calls for.  Rather, "in order to proceed under the 'regarded
as' prong of the ADA, a plaintiff must demonstrate that the employer believed that the employee
(1) had an impairment (2) that substantially limited (3) one or more major life activities."
*Squibb v. Mem'l Med Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007).  Motorola acknowledged Mr.
Jackson's impairment, but they certainly never considered it to "substantially limit" one or more
of his major life activities.

duration" of the activity "as compared to the condition, manner, or duration which the average person in the general population."  29 C.F.R. § 1630.2(j)(1).  I now consider Mr. Jackson's major life activities in turn:

### i. Walking.

To be disabled with respect to walking, a plaintiff must be "substantially" limited in his ability to walk, the limitation must be permanent or long term and considerable compared to the walking most people do in their daily lives.  *Sears,* 417 F.3d at 802.

With respect to Mr. Jackson's condition, his specific limitations with respect to walking are somewhat hard to discern.  In his response brief, he has described the limitation as being able to "only walk for or two blocks before he begins to experience pain and must rest."  This is distilled form the following key testimony from his deposition:

Q:...After you got injured in 2001, were you able to walk?

A: Yes, I was able to walk but it was very slow.

Q: So you were walking slowly from 2001 to the time you had surgery in 2003?

A: Yes.

Q: After the surgery in 2003, what was your walking like then?

A: It took time to develop, to regain my strength and muscle, my back strength.  I started walking pretty good after that.

Q: So between 2001 to 2003 when your walking got better, you were able to walk but you were in pain?

A: I'd have some good days and then I'd have some bad days just like I do now.

Q: All right.  You said before that you typically walk two blocks and then it starts hurting, is that right?

A: No, I said one block.

Q: Okay.  So after one block it starts hurting.  What do you do then after you walk one block?

A: I stop and rest.

Q: You stop and rest?  What if you're going a distance that's more than one block?

A: I don't usually walk more than one block.

Q: Didn't you say that you walked with your grandson?

A: One block.

Q: Didn't you have to return?

A: Yeah, but when I start hurting then I return.

Q: And then you stop walking?

A: Then I stop walking.

Q: So you've never walked more than one block since 2001?

A. Probably not.  I can't recall.  I probably have, but I don't make a habit of it because I can't do it.

Q: You testified earlier that sometimes you take the train to work, is that right?

A: I walk two blocks to the bus, catch the bus.  The bus takes me to the Blue Line, and I'm at work.  It's not a lot of walking.

Mr. Jackson analogizes his condition to that of the plaintiff in *Sears* who won a reversal of summary judgment on the issue of whether her walking was "substantially limited."  *Id.* at 802.  In *Sears*, the plaintiff was specifically diagnosed with neuropathy stemming from diabetes. *Id.* at 794.  The Seventh Circuit reversed summary judgment for the defendant when the plaintiff

was "unable" to walk a single city block without one leg and both feet becoming numb. *Id.* at 802. When the numbness ensued, the plaintiff felt as if she needed to use both of her hands to deliberately lift her own legs. *Id.* She often had to hold on to a wall to avoid falling. *Id.* Two years after leaving her job with the defendant, she was unable to walk more then twenty feet. *Id.* The Seventh Circuit noted that while the later deterioration did not bear directly on the question of the plaintiff's disability in the relevant timeframe, it was corroborative of the permanence of her condition. *Id.*

There are several points of departure, therefore, from the plaintiff in *Sears*. The first is the severity as such, in that the *Sears* plaintiff, at the time of her adverse employment action, essentially could not walk more than a single block. Mr. Jackson, in contrast, "usually" doesn't walk more than a block but plainly has the ability to, albeit with some pain. Second, in *Sears* the plaintiff's doctor had specifically noted the neuropathy and recommended walking restrictions. Mr. Jackson's surgeons and other doctors have never restricted his walking. Finally, Mr. Jackson now regularly walks two blocks to and from the train station and additionally walks while at work. This stands in contrast to the *Sears* plaintiff whose condition's permanence was confirmed when it deteriorated to the point of her not being able to walk over twenty feet.

While no comparison is perfect, Mr. Jackson is much closer to the plaintiff from *Fredrickson v. UPS, Inc.*, 581 F.3d 516 (7th Cir. 2009). In *Fredrickson*, the plaintiff lost the issue of disability when he claimed substantial limitations on his walking due to fatigue and other complications associated with his leukemia. *See id.* at 521-24. The plaintiff had testified at his deposition that climbing a single flight of stairs made him "feel as though he 'just walked up the side of a mountain.'" *Id.* at 521. He stated that he got tired just walking the aisles of a grocery store and that he could not walk continuously from an airport drop-off point to a

departure gate. *Id.* Like Mr. Jackson, Fredrickson's own physicians did not corroborate the walking limitations and did not impose any restrictions on walking. The Seventh Circuit acknowledged that Fredrickson's testimony made it "clear" that his leukemia-related symptoms impaired his walking "to some degree," but that this testimony alone did not rise to the level of a "substantial limitation." *Id.* at 522.

This is ultimately the case with Mr. Jackson's walking. *Sequalae* from his herniated disc and surgery definitely appear to affect his ability to walk to a modest degree, but no reasonable jury could find that the limitations are so substantial as to amount to a disability.

### ii. Lifting and Other Manual Tasks

Interpreting the "performing manual tasks" aspect of being disabled, the Supreme Court has held that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term." *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002)[3].

Mr. Jackson suffered his back injury in 2001 and underwent surgery to correct the herniated disc (a "laminectomy") in 2003. He returned to work on October 20th of that year. At that time, he was under a one-month lifting restriction of 25 pounds. After a follow-up appointment in November 2003, the restriction was relaxed to 35 pounds through January 6, 2004. One month later, on February 9, 2004, Mr. Jackson's doctor established a permanent

---

[3]This formulation from *Toyota* has been abrogated in the ADA Amendments Act. *See Supra note 1.* However, it remains the interpretive law that governs this case because of when the conduct occurred. *See EEOC v. AutoZone, Inc.*, 2010 U.S. App. LEXIS 26410 at *15 n. 3 (7th Cir. Dec. 30, 2010).

lifting restriction of 50 pounds.  Beyond these restrictions, Mr. Jackson states that he needs his grandson to help him lift his groceries.

As a lifting restriction, this will not do.  The Seventh Circuit has expressed doubts that even a ten-pound lifting restriction could qualify as a "substantial limitation" under the ADA. *Mays v. Principi*, 301 F.3d 866, 869-70 (7th Cir. 2002).  Further, it has expressly held that a forty-five pound restriction was not a substantial limitation.  *See Contreras v. Suncast Corp.*, 237 F.3d 756 (7th Cir. 2001) (citing with approval cases from other circuits involving twenty and twenty-five pound restrictions).  Plaintiff's fifty-pound lifting restriction is not a "substantial limitation."

In addition to his long-term fifty-pound lifting restriction, Mr. Jackson's physician has restricted Mr. Jackson from prolonged or repetitive bending.  Mr. Jackson has also reported that it takes him around twenty minutes to get dressed, as opposed to the five-to-ten minutes it took him before his injury.  Additionally, Mr. Jackson claims that he goes shopping for his groceries, but that his eleven-year-old grandson must help him lift and carry those groceries.  Similar help is needed for "a lot of things around the house," including fixing plumbing and cutting the grass.  On the other hand, he is able to get out of bed and to bathe, shave, and groom himself.  He can drive and go shopping (though he "usually" has his grandson help with some aspects).  He can no longer "roll...around" with his grandson in the grass but he can throw and catch a ball with him.

Mr. Jackson plainly has some difficulty attendant with his back condition.  But no jury could reasonably conclude on this evidentiary basis that he was "substantially limited" in performing manual tasks in that he was prevented or "severely restricted" in his manual abilities.

Ultimately, Mr. Jackson's condition calls to mind the Seventh Circuit's oft-repeated phrase: "The number of Americans restricted by back problems to light duty is legion. They are not disabled." *Mays v. Principi*, 301 F.3d 866, 869-70 (7th Cir. 2002).

Because Mr. Jackson does not qualify as disabled under the ADA, I need not consider any of his claims insofar as they rely on disability discrimination. *See Fredrickson*, 581 F.3d at 524.

### B. Title VII Discrimination - Hostile Work Environment

Mr. Jackson's discrimination count is time-barred to the extent that it relies on a hostile work environment theory.

Title VII of the Civil Rights Act of 1964 states that it "shall be an unlawful employment practice for an employer...to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2. One actionable theory under Title VII is the hostile work environment theory, which requires a plaintiff to show: 1) the work environment was both subjectively and objectively offensive; 2) that the harassment was based on membership in a protected class; 3) that the conduct was severe or pervasive; and 4) that there is a basis for employer liability. *See Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908 (7th Cir. 2010).

A Title VII discrimination case must be brought within 300 days of an alleged unlawful employment action.[4] *See* 42 U.S.C. § 2000e-5(e)(1). In *National Railroad Passenger Corp v.*

_____

[4]The time period is 180 days if a charge is made directly to the EEOC and no state agency is involved. *See* 42 U.S.C. § 2000e-5(e)(1). Here, Mr. Jackson filed a charge with the Illinois Department of Human Rights, but the form explicitly states that the charge is noticed to the EEOC as well. I give Mr. Jackson the benefit of the doubt. *See Turner v. The Saloon, Ltd.*, 595 F.3d 679, 684 n. 5 (2010) (suggesting 180-day limitation applies only where a plaintiff does not file "any...charge with an Illinois agency.")

*Morgan*, 536 U.S. 101, 122 (2002), the Supreme Court held that under a hostile work environment theory, a series of acts constituting the hostility can be considered, so long as one of them happened within the 300 days preceding the charge. Here, the Plaintiff has described some undeniably offensive actions he experienced or witnessed at Motorola, including his former supervisor's asking "where's that nigger?," the exclamation of a similar expression on a ballfield, and the incident where a sixty-two-year-old black man, apparently of high skill, was told to sweep in a corner. But the first two incidents happened in either the late 1980s or possibly 1990 and the third incident occurred in 1999 or 2000. By any measure, these are substantially outside of the 300-day limitations period marked backwards from the filing of the charge on January 19, 2007.[5]

C. Discrimination - Discrete Act of Termination

Mr. Jackson claims that his termination was because of his age in violation of the ADEA and because of his race in violation of Title VII. Both claims invoke the same analytical framework. *See Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1114 n. 3 (7th Cir. 2009). A plaintiff can prove up either claim using direct or indirect methods of proof. *Id.*

i. Direct Method of Proof

Mr. Jackson cannot prove his case under the direct method. A plaintiff proceeding under the direct method of proof establishes discriminatory intent by producing evidence, direct or circumstantial, that he was terminated for an unlawful reason. Like most cases, direct evidence is not at issue here. That is because direct evidence is tantamount to an "admission from the decisionmaker about his discriminatory animus." *Id.* If Motorola has discriminated at all, it

_____

[5] There may be other potential problems with some of these incidents as sufficient to establish a racially hostile environment, but because the limitations aspect is dispositive I need not go into them.

certainly has not made an admission about it - all of the relevant decisionmakers here have consistently and steadfastly refused any racist or age-biased motivation, and none were ever caught in an admission of those kinds.

A plaintiff proceeding under the direct method can also provide circumstantial evidence. This type of evidence directly establishes discrimination, but "through a longer chain of inferences." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (quotation omitted). Circumstantial evidence includes:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007).

As to the first type of circumstantial evidence, there was Mr. Jackson's former supervisor asking "where's that nigger?" and the similar language overheard on the ballfield, both in 1989 or 1990. While this language is deplorable, these incidents are plainly too far removed in terms of time and circumstance to support a charge of discriminatory intent for a termination which occurred in 2006. *See Nagle*, 554 F.3d at 1115 ("Comments can still be made at a time that is too distant from when the adverse action occurred to suggest that discrimination motivated the action."); *see also Conley v. Vill. of Bedford Park*, 215 F.3d 703, 711 (7th Cir. 2000) (comment made two years prior to adverse action too remote); *Hemsworth*, 476 F.3d at 491 (one year).

Also under the first category of circumstantial evidence is the episode in which a sixty-two-year-old African-American technician was told to sweep in a corner. Jackson's implication is that this was a demeaning, racially motivated punishment. While in some circumstances it

certainly could be, there are several flaws with this episode as circumstantial evidence in this case.  First, the episode was in 1999 or 2000, at least six years before Jackson's termination. Second, Jackson does not identify either the alleged victim or the perpetrators of the smear, so much is left to speculation about the context and content of the incident.  Indeed, Motorola counters that technicians are frequently required to clean up after tests are run and equipment moved around, so it is likely that there was absolutely no racial animus involved in the incident. But even when viewed in the light most favorable to Jackson - that is, assuming this incident did have a racial cast - the incident was simply too long ago to connect it to race-motivated termination of Jackson in the fall of 2006.

Finally, Jackson has attempted to supply the second type of circumstantial evidence, namely that younger, non-black employees were treated more favorably.  His first evidence of this is the claim that Eric Bohn and Julie (last name unknown) received training on the "NICE" system.  NICE was a new technology and familiarity with the system could have helped Jackson's career.  Bohn later received a raise and promotion which Jackson did not.  Dan Chigi, Dan Posacki, and Suda (surname omitted) also were given raises and promoted while Jackson was not.  Chigi and Posacki are white, Suda is Asian.  All were substantially younger than Jackson.

This showing is not enough.  It is the plaintiff's burden to put forth similarly situated employees, and "a plaintiff must show that there is someone who is directly comparable...in all material respects."  *Winsley v. Cook County*, 563 F.3d 598, 605 (7th Cir. 2009).  While it is true that Eric Bohn, Dan Chigi, Dan Posacki, Julie (LNU), and Suda (LNU) were test engineers in SIT, beyond that it is not clear how they were similarly situated to Mr. Jackson.  Mr. Jackson has not produced any information with regard to their work history, performance, or expertise.

When a plaintiff has negative performance in their own work history, as Jackson does, such negative evaluations are part of the "similarly situated" analysis. *See Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 682 (7th Cir. 2007). Thus Jackson must show that at least one of the named employees at the same job level had similarly negative reviews, but despite this flawed performance or misconduct, received treatment more favorable than Jackson.[6] *See id.* (citing *Jordan v. City of Gary*, 396 F.3d 825, 834 (7th Cir. 2005)). Jackson had "the opportunity, during discovery in this case, to request documents and conduct depositions" in order to bolster his claims that similarly situated employees were treated better than he was as a 52-year-old African-American. *Winsley*, 563 F.3d at 605. He has failed to do so.

<u>ii. Indirect Method of Proof</u>

Under the indirect method, a plaintiff must show that he is a member of a protected class, he was meeting his employer's legitimate performance expectations, he suffered an adverse employment action, and he was treated less favorably than similarly situated individuals who are not African-American or over forty. *Nagle*, 554 F.3d at 1119. If a plaintiff establishes this *prima facie* case, the defendant can offer a legitimate, non-discriminatory basis for the adverse action. *Martino v. MCI Commc'n. Servs.*, 574 F.3d 447, 453 (7th Cir. 2009) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). If the employer does so, the burden returns to the plaintiff to prove that this stated reason was a pretext for discrimination. *Id.*

For the reasons addressed above, Jackson has not established his *prima facie* case because he has produced no similarly situated employee who was treated more favorably.

---

[6] Jackson attempts to evade this requirement when he says that his bad reviews themselves were racially motivated, but his only evidence of that is his own assessment of himself as having done better. This is not enough. *See, e.g., Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1056 (7th Cir. 2006).

D. Retaliation

Mr. Jackson's final claim is for retaliation under Title VII of the Civil Rights Act. A plaintiff making such a claim can proceed under the direct or indirect methods of proof. *Stephens v. Erickson*, 569 F.3d 779, 786-87 (7th Cir. 2009). Mr. Jackson asserts that his showing satisfies either approach. Under the direct method, Mr. Jackson must show via direct or circumstantial evidence that 1) he engaged in a statutorily protected activity; 2) he suffered a materially adverse employment action; and 3) there is a causal connection between the two. *Id.* Under the indirect method, Mr. Jackson would first prove up a *prima facie* case of retaliation. *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008). This is done by establishing the first two elements of the direct method (protected activity and adverse action), and then additionally showing that 3) he met his employer's legitimate expectations; and 4) he was treated less favorably than similarly situated employees who did not engage in protected Title VII activities. *Id.*

The plaintiff cannot satisfy the third element of the direct method. First, Motorola concedes that Mr. Jackson made a discrimination complaint in a meeting with Lavine Douglas, an Employee Relations Specialist, on or about April 19, 2006. Second, it is undisputed that Mr. Jackson suffered an adverse employment action when he was selected for RIF in September 2006 and terminated in November. That leaves only the third element - causal connection - at issue. Here, Plaintiff relies on suspicious timing to establish this element. *See Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009) (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). Specifically, Mr. Jackson points to the fact that he alleged discrimination in his employment evaluations in the April meeting, and then was not-so-coincidentally targeted for RIF in September and actually let go in November. The problem is

that this is the only evidence he has cited and the Seventh Circuit repeatedly has asserted timing, "standing alone," will rarely suffice. *See Argyropoulos* 539 F.3d at 734. Further, other aspects of this case firmly establish that this is not the "rare case" where timing alone may satisfy the direct method. First, there was a lapse of five months between Mr. Jackson's complaint and his selection for RIF. *Cf. id.* (seven-week interval insufficient to show suspicious timing). In addition to the bare passage of time, Mr. Jackson had "needs improvement" ratings in the two years preceding his discrimination complaint. It was those ratings that Motorola cited as putting him in line for RIF, and they were duly documented prior to the RIF selection process.

Under the indirect method, Mr. Jackson has again failed to produce similarly situated personnel who were treated better, as explained in the discrimination analysis.

## V. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.

ENTER:

James B. Zagel
United States District Judge

DATE: March 7, 2011